Filed 8/21/15  P. v. Hinojosa CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE HINOJOSA,<br><br>    Defendant and Appellant. | B254911<br><br>(Los Angeles County<br>Super. Ct. No. PA071636) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Dalila C. Lyons, Judge.  Affirmed in part and reversed in part with directions.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jason Tran, Supervising Deputy Attorney General, and Jonathan M. Krauss, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Jose Hinojosa appeals from the judgment entered following a jury trial in which he was convicted of shooting at an occupied motor vehicle and two counts of attempted murder, with gang and firearm-use findings. Defendant pleaded no contest to a charge he violated a gang injunction. Defendant contends the trial court erred by admitting evidence he was served with the gang injunction and by denying his request for discovery of a photograph of him taken by gang officers during a traffic stop in 2007. He argues both errors violated his federal constitutional right to confront the witnesses against him. We conclude the trial court erred with respect to the photograph, but reject defendant's claim regarding the gang injunction evidence.

## BACKGROUND

### The Shooting

Around 10:50 p.m. on April 28, 2011,[1] Anthony Ramirez parked across the street from the Sylmar home of John Rios in order to visit his friend Jose, who was in turn visiting Rios. Ramirez's brother, David Gaxiola, was in the passenger seat of Ramirez's car. Ramirez had previously been a member of the Pacoima Knock Knock Boys gang, and he knew that the rival San Fer gang claimed the area they were visiting as part of its "turf." Ramirez was not dressed in gang-type apparel and wore a long-sleeve shirt that covered his tattoos. Gaxiola had never been a gang member and did not associate with gang members. According to Rios, Jose was a gang member.

As Gaxiola was getting out of the car and before Ramirez could do so, a white Chevy Tahoe SUV pulled up alongside the driver's side of Ramirez's car, with the window of the Tahoe's front seat passenger aligned with Ramirez's window. The Tahoe was higher than Ramirez's car, which was a Saab station wagon, and the interior of the Tahoe was dark, whereas the light was on inside the Saab because the passenger door was open. Ramirez could nonetheless see the Tahoe's driver and passenger clearly. Ramirez

---

[1] Undesignated date references pertain to 2011.

2

did not see any damage to the body of the Tahoe, but noticed it had very shiny custom rims.

The Tahoe's front seat passenger "hit up" Ramirez, i.e., asked him where he was from, which Ramirez understood to be an inquiry about his gang affiliation. Ramirez testified that he responded, "'I'm from Pacoima Knock Knock Boys,'" then added, "'I'm not here to disrespect your neighborhood, I'm not here to cause any problems. I just want to visit a friend.'" Ramirez admitted, however, that he lied to the police and told them that he merely responded, "[I] don't bang." Gaxiola told Los Angeles Police Department (LAPD) Detective Craig Hewitt that he told the passenger in the Tahoe that he did not "bang."

Ramirez testified the passenger who had hit him up looked at the driver of the Tahoe, whom Ramirez identified at trial as defendant. Defendant nodded his head and extended his right arm. Ramirez demonstrated the gesture in court, but no one described it for the record. The passenger then asked, "'Where did you say you were from again?'" Ramirez testified he began to reiterate that he was from Pacoima, but before he could finish his sentence, the Tahoe passenger began shooting at him. Ramirez saw the gun quite clearly and insisted it was a semiautomatic, not a revolver. Ramirez felt a shot or shots strike his left arm and ribs. He heard a total of three to five shots. Gaxiola ran away from the car. Ramirez testified he also ran, but Rios and Gaxiola testified that Ramirez was still in the car after the shooting when they went to check on him and assist him.

Rios testified that Jose screamed something that caused the Tahoe driver to look at Jose, Rios, and Rios's girlfriend, Jennifer Collins, who were standing outside Rios's garage watching the events unfolding. Ramirez testified that as the Tahoe drove away, someone inside it yelled, "'Varrio San Fer.'"

Ramirez admitted at trial he did not tell anyone about someone yelling "'Varrio San Fer'" as the Tahoe drove away or about the driver nodding and extending his arm until he testified at the preliminary hearing. Ramirez explained that he had to tell the

3

truth at the preliminary hearing because he was under oath. He further explained that he had previously withheld this information and lied to the police because he feared retaliation and wanted to "protect" the perpetrators from arrest and prosecution for a gang-related offense. He hoped "they" would forget about it. Even when Hewitt interviewed him three weeks after the shooting and showed him a photographic array from which he identified defendant, he was still trying to protect the perpetrators. Although the police did not threaten him, Ramirez felt he had to give them some information or he would be found in violation of his parole. He tried to give them as little information as possible. Ramirez admitted that he asked for favorable treatment regarding his own new burglary case in exchange for his testimony at the preliminary hearing and a reduction of his sentence in that case in exchange for his testimony at trial. Both requests were refused.

Gaxiola testified that he did not see the driver do anything or hear any gang-related statements, but he also testified he had little recall of the events because he was intoxicated at the time. He further testified Ramirez had told him he did not get a good look at the driver. Rios, who testified he had an excellent view into the Tahoe, did not see the driver make any movements, see the front passenger turn to look at the driver, or did not hear any gang-related statements. LAPD Officer Matthew Vannatter testified no one except Ramirez ever mentioned any action by the driver other than driving.

Ramirez testified that the Tahoe depicted in a photograph of an SUV owned by defendant's girlfriend, Christina Lopez, looked just like the one used in the shooting except the rims were different. Rios testified and had told the police that the Tahoe he saw was a z71 model with stock rims. The photograph of Lopez's Tahoe depicted the exact same type of vehicle with the same rims, but there was a "very obvious" dent in the rear quarter panel on the driver's side of the one in the photograph, whereas there was no dent on the Tahoe used in the shooting.

4

Rios testified that the men in the Tahoe were much younger than defendant. He testified defendant was not one of those men and did not look like the driver at all. He had told the prosecutor that in a meeting a few weeks before defendant's trial.

Ramirez had been struck by a single bullet that went through his arm, then struck his ribs, but did not penetrate. At the hospital he received a Tetanus shot and his wounds were bandaged, then he discharged himself. He suffered numbness and pain for a month.

**The investigation and events subsequent to the crimes**

Responding police officers noted bullet "impacts" on the exterior of Ramirez's car and found three expended bullets in the street, one in the back seat of Ramirez's car, and one on the ground alongside the passenger door of his car. They found no casings.

Rios testified that he saw a Tahoe that looked identical to the one used in the shooting at a neighborhood liquor store about a week after the shooting. As Rios approached the vehicle, the person in the driver's seat hid, and Rios did not get a good look at him. Rios feared gang retaliation for his testimony.

On the night of May 15, Matthew Vannatter and several other gang offices who had responded to the crime scene were out on patrol together. Vannatter saw a white Tahoe parked in front of a "very active" "San Fer gang house" located less than one block from the crime scene. As the officers left their vehicle to investigate the Tahoe, two men wearing San Francisco Giants hats got out of the passenger side of the Tahoe and "walked hurriedly" into the house, all the while ignoring the officers' commands to stop. Vannatter, who also served as the prosecution's gang expert, testified the "SF" logo on the hats was a symbol used by the San Fer gang. Defendant got out of the driver's seat of the Tahoe, approached the officers, and identified himself. Vannatter had previously met defendant. Defendant told Vannatter that the Tahoe belonged to his girlfriend and that he had permission to drive it. Vannatter verified that the Tahoe was registered to Christina Lopez, and the officers took the photograph of the vehicle later shown to Ramirez and Rios.

5

On May 18, Vannatter and at least five other gang officers went to defendant's home to arrest him. As they approached his home, they saw defendant walking toward the white Tahoe. Defendant looked in their direction and made eye contact with Vannatter. Defendant then reached into his waistband, bent down, and tossed something under the vehicle as the officers approached with their guns drawn. Defendant was arrested without resistance. Vannatter and another officer looked under the Tahoe and recovered a fully loaded six-shot "blue steel revolver." Ballistics testing established that the recovered revolver had fired the five lead bullets recovered from the crime scene.

After defendant's arrest, Ramirez selected defendant's photograph from an array as looking "similar" to the driver, but he testified at trial he believed the person he selected was the driver and he would not have identified anyone if he had been uncertain.

**Evidence introduced to establish the gang enhancement allegations**

Vannatter served as the prosecution's expert witness regarding the San Fer gang. He testified, inter alia, that the crime scene was within the territory claimed by the gang; the gang's primary activities include murder and drive-by shootings; all Pacoima gangs are enemies of the San Fer gang; tattoos specific to the gang include "SF," "VSF," the name of a member's clique, and "91340," which is the zip code for San Fernando; members often wear clothing or hats for the San Francisco Giants or 49ers, Seattle Mariners hats, Superman shirts, or belt buckles depicting an "S." Vannatter further testified that "typical," "general" tattoos for Hispanic gang members included three dots, a teardrop, or "818" for someone from the valley, but these did not indicate a specific gang. Defendant's tattoos included three dots and "818" on his hand, which Vannatter opined would allow defendant to show his tattoos while making the gang's hand sign. Defendant also had "Rosa," some flowers, and "Hinojosa" tattoos. Gaxiola also had an "818" tattoo and, although he was not a "documented" gang member, Vannatter considered Gaxiola a Pacoima gang associate because he associated with Ramirez and had been convicted of crimes.

6

LAPD gang Officers Alonso Menchaca and Pablo Rivera testified regarding a July 6, 2007 contact they had with defendant that was crucial to Vannatter's opinion testimony regarding defendant. Menchaca and Rivera conducted a traffic stop on a vehicle defendant was driving. Menchaca testified that defendant, as well as his two passengers, admitted being members of the San Fer gang. Defendant told Menchaca his moniker was Slim. Menchaca testified defendant was wearing a belt buckle with the letter "S" on it, which Menchaca knew was San Fer gang attire. Menchaca prepared both a report and an "F.I. card" regarding the stop, which turned into an arrest. The report was produced at trial, but the F.I. card was not. Menchaca testified he unsuccessfully tried to find the F.I. card, and he believed it had been "sent downtown and filed." He made no effort, however, to obtain the card from downtown. Menchaca's report did not include any reference to defendant's gang admission, even though the report set forth questions Menchaca asked defendant and defendant's responses thereto concerning the subject of the arrest. Nor did the report refer to defendant's belt buckle, even though it contained a section to describe the "clothing worn." Vannatter testified the gang admission "would go on an F.I. card."

Menchaca and Rivera testified that Menchaca photographed defendant July 6, 2007, then loaded the digital photo into a gang database. Both testified they were unable to print it because the database contents were confidential and for law enforcement use only. Menchaca explained it would "apparently" require a court "request" to obtain a copy of the photo. Rivera testified he had looked at the photo in the gang database during the week before he testified at trial, but did not recall whether defendant was wearing an "S" belt buckle in the photo. Menchaca testified he, too, had refreshed his memory before he testified by viewing the photograph.

Vannatter and Rivera testified they served defendant with the injunction against the San Fer gang on May 14, 2009. Defendant denied he was a member of the gang, but signed a proof of service at the officers' request. Vannatter testified the injunction "has a lot of accords and behaviors that bars that gang member from doing, such as associating

7

with others in a safety zone area, not committing crimes, not carrying weapons, not threatening anybody, stuff like that." The proof of service listed defendant's tattoos, noted that he admitted membership on July 6, 2007, and identified the people with whom he had been associating on July 6, 2007. Vannatter testified defendant was served with the gang injunction "[b]ecause he was identified as a San Fer gang member, self-admitted San Fer gang member." Rivera also filled out an F.I. card that day, which was produced at trial. Rivera noted on the card that defendant was wearing an "S" belt buckle. Vannatter testified, "[A]nything with an S on it worn by a San Fer gang member, it's a gang identifier."

Vannatter opined defendant was a member of the San Fer gang. His opinion was premised on several factors: when the officers saw him on May 15, he was in San Fer gang territory "with two other gang members that had fled from the vehicle; he has "gang style tattoos on his body"; he previously admitted he was a member and had a moniker; he had been served with the injunction against the San Fer gang; he was wearing an "S" belt buckle and associating with two San Fer gang members when Menchaca and Rivera stopped him on July 6, 2007; he was wearing an "S" belt buckle when Vannatter and Rivera served him with the gang injunction; and on the date of his arrest, he was also "in a gang turf area, and there was behavior consistent with what [Vannatter] would expect a San Fer gang member to be participating in on that particular date."

In response to a hypothetical question based upon the prosecution's evidence, Vannatter further opined that the crimes would have been committed for the benefit of the San Fer gang because they occurred in San Fer territory and their commission enhanced the gang's reputation. He explained that the presence of a member of a rival gang within San Fer territory reflected disrespect for the San Fer gang. He further opined the driver's "gesture with the nod and the passing of the object would suggest to me an older member having a younger member commit the crime." Shouting the gang's name indicated the perpetrators wanted everyone to know who committed the offenses to instill fear of the

8

gang, thereby deterring victims and witnesses from cooperating with the police and allowing the gang to control the community.

**Defense evidence**

Denise Mitchell, who was related to the mother of defendant's children and also a close friend of Christina Lopez, testified that the dent on the Tahoe's driver's side rear door occurred on April 4, 2010, at Staples Center when she borrowed the vehicle and drove defendant and others to a Lakers' game. It was never repaired.

Detective Hewitt confirmed that Ramirez requested leniency in exchange for his testimony at the preliminary hearing and a sentence reduction in exchange for his testimony at trial. In both instances, Hewitt denied Ramirez's requests.

**Verdicts and sentencing**

During jury selection defendant pleaded no contest to a charge of violating a gang injunction. The jury convicted him of shooting at an occupied motor vehicle and two counts of attempted murder. The jury found these offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members. (Pen. Code, § 186.22, subd. (b)(1).)[2] The jury further found that in the commission of each offense, a principal used a gun and intentionally fired a gun. (§ 12022.53, subds. (b), (c), (e).) The jury did not make any findings on the allegations that the attempted murders were willful, deliberate, and premeditated, or on allegations that a principal intentionally fired a gun, causing great bodily injury (§ 12022.53, subds. (d), (e)). The court failed to notice these omissions until after the jury had been discharged. It later dismissed those allegations.

Defendant waived his right to a jury trial on prior conviction allegations and stipulated he was the person who suffered the alleged prior convictions. The court found true allegations defendant's prior assault with a deadly weapon conviction constituted a

---

[2] Undesignated statutory references are to the Penal Code.

serious felony conviction for purposes of both the "Three Strikes" law and a section 667, subdivision (a)(1) enhancement allegation. The court also found true one section 667.5, subdivision (b) prior prison term allegation.

The court sentenced defendant to an aggregate second strike prison term of 36 years to life, consisting of 15 years to life for shooting at an occupied motor vehicle pursuant to section 186.22, subdivision (b)(4)(B), doubled pursuant to the Three Strikes law, plus 5 years for the section 667, subdivision (a)(1) enhancement, plus 1 year for the section 667.5, subdivision (b) enhancement. The court imposed a 6-month concurrent sentence for violation of the gang injunction and stayed the sentences on the attempted murder convictions.

## DISCUSSION

### 1. Admission of gang injunction evidence

Defendant contends that the trial court erred by admitting evidence that he had been served with the injunction against the San Fer gang. He argues the trial court abused its discretion by overruling his Evidence Code section 352 objection to this evidence and that admission of this evidence violated his federal constitutional confrontation right.

### a. Proceedings in the trial court

During the trial, the prosecutor informed the court he wanted to use evidence that defendant had been served with the gang injunction against the San Fer gang as proof that defendant was a member of the gang. The prosecutor assured the court that the officers who served defendant with the injunction would testify about serving him and explain that they did so because they believed defendant was a member of the gang, then explain the basis for their beliefs.

Defense counsel objected pursuant to Evidence Code section 352 on the ground the injunction evidence would confuse the jury. He explained: "That injunction doesn't prove he is a gang member. That's the problem. . . . [¶] . . . I'm concerned the jury is going to see that gang injunction and they are going to use it to say that yes, he is a gang member. It doesn't say that. It doesn't say that at all. . . . It never says or makes a

10

judicial finding of anybody who is a gang member, your honor. By putting that in there, the district attorney's stated purpose is to prove he is a gang member. [¶] That injunction doesn't do that. I'm concerned the jury is going to be given the weight of a court order indicating that it's proof that [defendant] is a gang member, which in no way it says that." Counsel protested that defendant was not even named in the injunction or any of its attachments and argued: "It is the police opining that he falls within this because they believe he is a San Fer, so they go and serve him, your honor. That's a far cry from a judicial officer making a finding that he is a gang member, your honor."

The trial court overruled the objection and allowed the prosecutor to introduce the evidence to "corroborate their belief and support their belief" that defendant is a gang member. The court noted that on cross-examination defense counsel could "make those arguments, that the service of the injunction is not necessarily a court order that the defendant is a gang member."

Thereafter, Vannatter and Rivera testified about serving defendant with the San Fer gang injunction on May 14, 2009, and Vannatter testified his service of defendant with the injunction was one of the bases for his opinion that defendant was a member of the San Fer gang. On cross-examination, Vannatter repeatedly insisted that although the injunction did not name defendant, defendant was nonetheless included within its scope because Vannatter had served him with it, and, "The proof of service adds people to the gang injunction." Defense counsel asked, "Other than the service sheet that shows you served him, do you have anything from the court that lists gang members, that lists him actually in the injunction?" Vannatter responded, "In the initial gang injunction, no. But the proof of service does add him, and it is approved by the city attorney." Vannatter admitted he had no documentation from the city attorney stating a belief that defendant was a gang member and directing the police to serve him with the injunction, but insisted, "It was served by us, approved by the city attorney."

11

### b. Defendant's Evidence Code section 352 objection

#### (1) Governing legal principles

Evidence Code section 352 provides that the court may, in its discretion, exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will either be unduly time consuming or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury.

We review any ruling on the admissibility of evidence for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 577.)

The court's erroneous admission of the evidence requires reversal only if defendant establishes that it is reasonably probable he would have obtained a more favorable outcome had the evidence been excluded. (Evid. Code, § 353, subd. (b); *People v. Earp* (1999) 20 Cal.4th 826, 878; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

#### (2) The trial court abused its discretion, but the error was harmless

Evidence that Vannatter and Rivera had served defendant with the gang injunction had little or no probative value. Defendant was not named in the injunction and had not been found by a court to be a member of the gang. The decision to serve him with the injunction was, as the prosecutor described to the court before it ruled upon defendant's objection to the evidence, a matter of Vannatter believing defendant was a member of the gang and deciding to serve him with the injunction based upon that belief. Thus, the fact Vannatter served defendant with the injunction amounted to nothing more than Vannatter's prior formation of an opinion that defendant was a San Fer gang member. The enduring nature of Vannatter's opinion did not "support" or "corroborate" his belief at trial that defendant was a member of the San Fer gang, it simply demonstrated it was an entrenched belief and he had not changed his mind. The same analysis applies with respect to Rivera, but because he was not serving as the prosecution's gang expert, his opinion was even less relevant. Accordingly, the probative value of evidence the officers had served defendant with the gang injunction was minimal or nonexistent.

In contrast, admitting evidence defendant had been served with the injunction against the San Fer gang created an extremely powerful risk that the jury would conclude erroneously that service of the gang injunction established defendant was a member of the gang. Although membership in the gang was not an element of any of the charges or even the gang enhancement allegations, such membership assists the prosecution in proving the gang enhancement allegations, specifically that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1)), by suggesting defendant's gang-related motive and casting defendant's conduct in a gang-related light.

The risk the jury might conclude that the gang injunction evidence proved defendant was a gang member substantially outweighed the minimal or nonexistent probative value of the evidence, and the trial court should have excluded it. Moreover, the evidence was not simply admitted as one factor upon which Vannatter relied, but was instead the subject of testimony by both Vannatter and Rivera regarding their conduct in serving the injunction. The prosecutor informed the trial court that the testimony would take this form and come from both Vannatter and Rivera before the trial court ruled upon defendant's objection. Under the circumstances, we conclude the trial court abused its discretion.

We nevertheless conclude defendant has not established a reasonable probability he would have obtained a more favorable outcome had the gang injunction evidence been excluded. Defense counsel's skillful cross-examination clarified that the gang injunction evidence amounted to nothing more than a belief by Vannatter and Rivera, with approval by the city attorney, that defendant belonged to the San Fer gang. Vannatter testified to the same opinion at trial, making the gang injunction evidence redundant. In addition, the evidence, albeit disputed, showed defendant had admitted membership on one occasion and had been seen wearing attire consistent with membership in the gang on several occasions. Perhaps most significantly, defendant's conduct during the charged offenses,

especially his conduct in stopping his vehicle alongside the victims' car and remaining there while his passenger "hit them up" and began shooting, supported a strong inference defendant acted to benefit the gang and with the specific intent to promote, further, or assist in criminal conduct by gang members. In short, the record strongly demonstrated that this was a gang-related crime in which defendant was a major participant. In light of that evidence, defendant has not shown that it is reasonably probable he would have obtained a more favorable result on the gang enhancement allegations, let alone the charges themselves, had the trial court excluded or limited the gang injunction evidence.

### c. Defendant's confrontation clause contention

#### (1) Governing legal principles

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) In *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354] (*Crawford*), the Supreme Court held the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53–54.) The confrontation clause does not restrict the introduction of out-of-court statements for nonhearsay purposes or the use of prior testimonial statements "when the declarant appears for cross-examination at trial," however. (*Id.* at p. 59, fn. 9; *People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 6 (*Cage*).) After *Crawford*, courts have "labored to flesh out what it means for a statement to be 'testimonial.'" (*Ohio v. Clark* (2015) __ U.S. __, __ [135 S.Ct. 2173, 2179] (*Clark*).)

In *Cage*, *supra*, the California Supreme Court delineated its understanding of the characteristics of the category: "We derive several basic principles from *Davis* [*v. Washington* (2006) 547 U.S. 813 [126 S. Ct. 2266]]. First, as noted above, the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the

14

formality and solemnity characteristic of testimony.  Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial.  Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.  Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses.  Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Cage*, *supra*, 40 Cal.4th at p. 984, fns. omitted.)

In its most recent pronouncement regarding the parameters of "testimonial" evidence, the California Supreme Court stated:  "Although the [United States] Supreme Court has not settled on a clear definition of what makes a statement testimonial, we have discerned two requirements.  First, 'the out-of-court statement must have been made with some degree of formality or solemnity.' (*People v. Lopez* (2012) 55 Cal.4th 569, 581.) Second, the primary purpose of the statement must 'pertain[] in some fashion to a criminal prosecution.' (*Id.* at p. 582; accord, *People v. Dungo* (2012) 55 Cal.4th 608, 619.)" (*People v. Leon* (2015) 61 Cal.4th 569, 603.)  The United States Supreme Court has also focused on whether, considering all relevant circumstances, including the identity of the interrogator and the informality or solemnity of the questioning, the primary purpose of questioning is to obtain "testimonial evidence against the accused." (*Clark*, *supra*, __ U.S. at p. __ [135 S.Ct. at pp. 2180–2181].)

Because the confrontation clause does not apply to out-of-court statements admitted for nonhearsay purposes, no confrontation violation occurs where an expert witness refers to out-of-court statements upon which he or she relied in forming an opinion because such "basis" evidence is not admitted for its truth. (*People v. Gardeley* (1996) 14 Cal.4th 605,

619 (*Gardeley*); *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153–154; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427.)

### (2)   Defendant forfeited his confrontation clause claim

In the trial court, defendant asserted only an Evidence Code section 352 objection to admission of the gang injunction evidence.  He never alerted the trial court to his present claim that introduction of the evidence would violate his confrontation rights.  The legal principles entailed in a *Crawford* confrontation clause claim are completely different from those presented by the Evidence Code section 352 objection defendant asserted in the trial court.   Accordingly, he forfeited his confrontation clause claim. (*People v. Riccardi* (2012) 54 Cal.4th 758, 801 ["except to the extent his claims rely on the same facts and legal standards the trial court itself was asked to apply, defendant has forfeited his contentions of federal constitutional error by failing to assert them before the trial court"].)

### (3)   No confrontation clause violation occurred

Even if defendant's confrontation claim had been preserved, we would necessarily reject it for several reasons.  First, the prosecutor introduced the gang injunction evidence by means of the testimony of Vannatter and Rivera.  Defendant vigorously cross-examined both officers.  There was no confrontation violation as to their testimony. Although Vannatter stated on cross-examination that the city attorney approved the service of the gang injunction on defendant, defendant did not object to Vannatter's references to the city attorney on any ground or seek to strike them.  This was a notable contrast to defendant's frequent, successful "nonresponsive" objections to, and motions to strike, the testimony of Vannatter and other police officers.  Thus, defendant forfeited any claim regarding introduction of an implicit statement of opinion by the city attorney by failing to object on any ground.

Second, pursuant to *Gardeley*, *supra*, 14 Cal.4th at page 619, out-of-court statements relied upon by an expert in forming an opinion are not admitted for their truth. Although this principle has recently become controversial (*People v. Hill* (2011) 191

16

Cal.App.4th 1104, 1128–1131) and the California Supreme Court has granted review in a case concluding that expert "basis" evidence sometimes is admitted for its truth (*People v. Archuleta*, review granted June 11, 2014, S218640), we are bound by *Gardeley* until it is abrogated by the Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We note that the trial court took care to admonish the jury both before and during Vannatter's expert testimony that the matters upon which an expert witness relied in forming his opinion were not to be considered for the truth of the matter asserted, but only to assess the expert's opinion.

As defendant notes, the trial court also instructed the jury in the charge that "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332.) Defendant argues this "essentially asked [the jury] to determine the truth of the testimonial hearsay relied upon by the expert." While it is quite possible the jury may have had difficulty following both CALCRIM No. 332 and the court's admonitions about the truth of the basis evidence, we are nonetheless bound by *Gardeley* and defendant has not challenged the use of CALCRIM No. 332, either at his trial or on appeal.

Third, even if evidence that the officers believed defendant was a member of the San Fer gang and therefore served him with the standing injunction against that gang is viewed as a statement or embodying an implied statement, it was not a "testimonial" statement for *Crawford* purposes. Although the appellate record does not contain or reflect the precise nature or terms of the San Fer gang injunction, gang injunctions in general are intended to abate a public nuisance resulting from the collective action of gang members. (See, e.g., § 186.22a, subd. (c); *People v. Engelbrecht* (2001) 88

17

Cal.App.4th 1236, 1242–1246.) Thus, the *primary* purpose of serving defendant with the San Fer injunction was not to establish or prove some past fact for possible use in a criminal trial, but to attempt to prevent him from congregating with members of the gang and committing specified acts in designated areas. Such service therefore did not fall within the scope of "testimonial" statements.

For all of the foregoing reasons, we reject defendant's confrontation clause claim.

**2.      Denial of request for disclosure of photograph relied upon by gang officers**

Defendant contends that the trial court erred by denying his request for disclosure of the July 6, 2007 photograph of him purportedly wearing an "S" belt buckle. He argues the court abused its discretion and that the error violated his due process and confrontation rights.

**a.      Proceedings in the trial court**

Outside the presence of the jury after both Menchaca and Rivera had revealed on cross-examination that Menchaca had taken a photograph of defendant wearing the "S" belt buckle but could not print it or produce it in court, defense counsel argued defendant's due process rights had been violated by allowing the police officer witnesses to refer to "police resources," including the photograph, without providing them to defendant. He argued the police and prosecutor were "put[ting] in evidence of physical items that they hide behind by hiding it in this overall police resource excuse." The prosecutor argued that the "protected information" in the Cal Gangs database "cannot be disclosed. A court order is required, and a hearing would have to result where the lawyer of the department would have to come out and argue the protected nature of the information and whether or not it can be disclosed."

Defense counsel informed the court he had "obtained Cal Gangs printouts many times." He also noted the prosecutor had represented that he would not rely upon the existence of a photograph of the belt buckle, but Vannatter had relied upon the photograph as a basis for his opinion. Defense counsel requested that the court order the police to produce the photograph.

18

The court denied the request, explaining: "You need to put into context this evidence. This is evidence that was used by the expert to form his opinion of whether or not the defendant was a gang member[.]" Counsel reminded the court that Menchaca also testified regarding the photograph. The court continued: "Exactly. All of this, as I admonished the jury, it is simply to be used not for the truth of the matter asserted, but to determine the basis for the expert's opinion. [¶] So you're asking that the court order the people to produce evidence that the expert used on which to base his opinion. [¶] At this time I am denying that request. That is not appropriate." Defense counsel added: "[I]t is not only that, your honor. It is used so the defendant can properly cross-examine the witness and produce impeachment type evidence to challenge the credibility of the witnesses." The court did not alter its ruling.

In the presence of the jury, defense counsel continued his cross-examination of Menchaca, who testified he took the photograph in question with a digital camera, then loaded the photograph "into a law enforcement confidential database." When defense counsel asked the name of the database the prosecutor objected that it was privileged information, citing Evidence Code section 1040. The court sustained the objection without further inquiry. Menchaca testified he had last viewed the photograph in the database "last . . . Tuesday or Wednesday." Menchaca further testified he took the photograph as defendant stood "[o]n the sidewalk," "near his vehicle," but declared, "Once it goes into that database, it becomes confidential."

### b. Governing legal principles

"Discovery is designed to ascertain the truth [citation] in criminal as well as in civil cases." (*Jones v. Superior Court* (1962) 58 Cal.2d 56, 58.) "'Absent some governmental requirement that information be kept confidential for the purposes of effective law enforcement, the state has no interest in denying the accused access to all evidence that can throw light on issues in the case, and in particular it has no interest in convicting on the testimony of witnesses who have not been as rigorously cross-examined and as thoroughly impeached as the evidence permits.'" (*Id.* at p. 59.) Accordingly, "The

19

defendant generally is entitled to discovery of information that will assist in his defense or be useful for impeachment or cross-examination of adverse witnesses. [Citation.] A motion for discovery must describe the information sought with some specificity and provide a plausible justification for disclosure." (*People v. Jenkins* (2000) 22 Cal.4th 900, 953.) A showing that the defendant cannot readily obtain the information through his or her own efforts will ordinarily justify disclosure of any unprivileged evidence or information that might lead to the discovery of evidence that is reasonably likely to assist the defendant in preparing his or her defense. (*Hill v. Superior Court* (1974) 10 Cal.3d 812, 817.)

Evidence Code section 1040 provides a public entity with a privilege against disclosure of "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public" where either disclosure is prohibited by a federal or state statute or "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice." (Evid. Code, § 1040, subds. (a), (b)(2).) Where the prosecution or police assert the privilege, a criminal defendant has the burden of showing that there is a reasonable possibility that the undisclosed information would be material on the issue of guilt. (*People v. Walker* (1991) 230 Cal.App.3d 230, 238 (*Walker*).)

"The official information privilege, once asserted, should not be sustained unless the court is presented with a showing that the information sought to be protected is covered by the privilege. There are, no doubt, circumstances where this is self-evident, or nearly so. (See, e.g., [*Walker*, *supra*, 230 Cal.App.3d 230 [police surveillance location]].) But if it is not, the party claiming the privilege must either show in open court why the matter is privileged, or declare that doing so would compromise the privilege. If it appears to the trial court, based on this representation, that the claim cannot be determined in open court without 'disclosure of the information claimed to be privileged,' the court may call for that disclosure in camera, pursuant to [Evidence Code] section 915,

20

subdivision (b)." (*Torres v. Superior Court* (2000) 80 Cal.App.4th 867, 873.) "[W]hen it is the state which seeks to withhold information from a criminal defendant, the stakes are particularly high; thus the court must ensure the process of assessing the state's claim of privilege affords the defendant due process." (*In re Marcos B.* (2013) 214 Cal.App.4th 299, 308.) Thus, the defendant must be given an opportunity to propose questions to be asked at an in camera hearing. (*Ibid.*) Before upholding the privilege, the trial court must also provide the defendant an opportunity to demonstrate a need for the information that may outweigh the public interest in nondisclosure. (*Torres*, at p. 874.)

If the trial court upholds the privilege but determines that the privileged information is material to the defense, it must "make such order or finding of fact adverse to the public entity bringing the proceeding as is required by law upon any issue in the proceeding to which the privileged information is material." (Evid. Code, § 1042, subd. (a); *Hines v. Superior Court* (1988) 203 Cal.App.3d 1231, 1234.) Sustaining the privilege regarding material information without making such an order or finding adverse to the public entity deprives the defendant of his fundamental right to cross-examine the witness on a material issue, thereby violating the defendant's federal constitutional right of confrontation. (*Hines*, at p. 1235.)

### c.    The trial court erred by denying disclosure

The photograph was undeniably material to the defense. Both Menchaca and Vannatter relied upon its reported depiction of defendant wearing an "S" belt buckle as evidence establishing that defendant was a member of the San Fer gang, which was in turn relevant to the truth of the mental state elements of the gang enhancement allegations. If the photograph did not depict defendant wearing the "S" belt buckle, defendant could have used it to impeach Menchaca and diminish the credibility of Vannatter's opinion defendant was a member of the gang.

In was not self-evident that the photograph of defendant, taken in a public location with defendant's cooperation, was "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the

public." While law enforcement agencies may limit access to the Cal Gangs database and some information in that database may indeed fall within the scope of the privilege, the mere fact the photograph had been entered into that database did not transform it into confidential information within the scope of the privilege provided by Evidence Code section 1040. Neither the prosecutor nor any of the police officers presented the trial court with a showing that the photograph was covered by the privilege, either in open court or in camera. The trial court erred by sustaining the privilege in the absence of such a showing.

The trial court's explanation that the photograph was merely basis evidence for the expert's opinion failed to consider that Menchaca testified to the existence and content (defendant wearing an "S" belt buckle) of the photograph and the jury was never instructed that it could not consider this testimony by Menchaca for its truth. Defense counsel pointed that out to the court, yet the court failed to consider this critical point.

The denial of disclosure of the photograph may have severely impaired defendant's ability to cross-examine Menchaca and Vannatter, thereby violating defendant's federal constitutional right to confront witnesses against him. If the photograph did not depict defendant wearing the "S" belt buckle, defendant could have used it to severely undermine Menchaca's credibility regarding the entire 2007 police contact with defendant. That 2007 contact was crucial to the prosecution's proof of defendant's gang membership and, in turn, its proof of the gang enhancement allegations because that was the only occasion on which defendant reportedly admitted he was a member of the San Fer gang. Nonetheless, Menchaca's report regarding that contact did not mention defendants admission of gang membership or refer to the "S" belt buckle, even though it included other statements by defendant and contained a section to describe the suspect's clothing. Rivera, Menchaca's partner during the 2007 contact, did not hear defendant admit gang membership and did not remember whether he was wearing an "S" belt buckle, even though Rivera had viewed the "confidential" photograph of defendant in the gang database a few days before he testified at defendant's trial. The purported gang

22

admission and belt buckle were critical factors logically tending to show defendant belonged to the gang and expressly relied upon by Vannatter to support his expert opinion regarding defendant's membership. Although the officers tried to explain away these omissions from the police report by saying that information would have been noted on an F.I. card, the F.I. card from that contact was the only F.I. card pertaining to defendant that the police did not produce at trial. They also admittedly made no effort to locate it in the police department's central records storage. Thus, the photograph was clearly material, and its nondisclosure may have severely impaired defendant's ability to cross-examine the gang officers.

Of course, the photograph may have depicted defendant wearing an "S" belt buckle, just as the officers testified. Under the circumstances, the appellate record is inadequate to permit a determination of prejudice under any standard or even whether the error actually infringed upon defendant's federal constitutional right to confront the witnesses against him. The only just and reasonable approach to determining whether the trial court's erroneous acceptance of the privilege claim prejudiced defendant is to reverse conditionally the findings on the gang enhancement allegations to allow the trial court to properly assess the validity and effect of the prosecution's Evidence Code section 1040 privilege claim. (*People v. Reynolds* (1982) 137 Cal.App.3d 1016, 1019; *People v. Ruiz* (1992) 9 Cal.App.4th 1485, 1489–1490.) Although defendant seeks reversal of the entire judgment, he has not explained why the effect of the error taints the jury's verdicts on the substantive charges or firearm findings. In our view, the effect of the error extends only as far as the nature and purpose of the testimony of Vannatter and Menchaca, which was to establish the truth of the gang enhancement allegations.

Upon remand, the trial court must conduct a hearing, in camera if necessary, to assess the privilege claim. If the prosecutor or police continue to refuse to produce the photograph for the court to review, the true findings on the gang enhancement allegations will remain reversed. If the prosecutor or police produce the photograph and it depicts defendant wearing an "S" belt buckle as described in the police testimony at trial, the trial

23

court shall reinstate the true findings on the gang enhancement allegations.  If the prosecutor or police produce the photograph and it does not depict defendant wearing an "S" belt buckle as described in the police testimony at trial, the true findings on the gang enhancement allegations will remain reversed.

**3.     Remaining contentions**

Defendant contends that the cumulative effect of the two errors he raises requires reversal.  We reject this contention because we have concluded that the admission of the gang injunction evidence was harmless and we are unable to assess whether any prejudice resulted from failure to disclose the photograph and are conditionally reversing the gang enhancement allegations.

Defendant also initially contended the abstract of judgment incorporated errors, but, as he concedes in his reply brief, the trial court corrected those errors during the pendency of this appeal.

## DISPOSITION

The judgment is reversed conditionally with respect to the true findings on the gang enhancement allegations. Upon remand the trial court is directed to conduct a hearing regarding the July 6, 2007 photograph of defendant purportedly wearing an "S" belt buckle about which Officers Menchaca and Rivera testified. If the prosecutor or police continue to refuse to produce the photograph for the court to review, the true findings on the gang enhancement allegations will remain reversed, but may be retried. If the prosecutor or police produce the photograph and it depicts defendant wearing an "S" belt buckle as described in the police testimony at trial, the trial court shall reinstate the true findings on the gang enhancement allegations. If the prosecutor or police produce the photograph and it does not depict defendant wearing an "S" belt buckle as described in the police testimony at trial, the true findings on the gang enhancement allegations will remain reversed, but may be retried. The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.


LUI, J.

We concur:


CHANEY, Acting P. J.


MOOR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25